23-2054 RESTEM v. Jadi Cell Mr. Ricchetti, please proceed. Yes, may you please the court. Joseph Ricchetti for RESTEM, LLC. Your Honor, just based on the order that was provided, we could start with standing or go right to merits. I just wanted to do whatever is best for the court. That would be great. Why don't you start with standing. Great. So I mean from our perspective, Your Honor, we submit that based on while we didn't have the benefit of the decision that was in the order at the time when we filed our opening brief following the precedent in LTAQ and IBM in the General Electric case, we believe the jurisdictional statement set forth concrete plans for RESTEM to bring their cells to the industry, you know, through that. And we believe that was sufficient to show that and to show the substantial risk of infringement. You know, we believe that to be particularly true because of the public nature of the information we were relying on, namely the FDA filings. These are all public filings, you know, that are available on the website. The fact that RESTEM is engaged in four FDA trials actively, working with universities such as Stanford and the University of Florida, demonstrates a desire to bring their cells to people in the U.S. I mean, do you, my question isn't your concrete plans to bring a product to market or your clinical trials. My only question of standing is whether there is in fact a substantial risk of infringement based on how you describe your own cells. And in particular, I mean, I think that you pretty strongly assert that your cells doesn't, don't express N-A-N-O-G. Does that make sense? Am I saying that right? I don't know. You are, Your Honor. I guess the issue just is, it's just not that we're, I don't believe we're saying that. You know, how we would say is that we're using kind of the majority process, which is also described in the 176 patent specification, so the cells are all being created. Now, again. No, but the process is so broad and it could create a gazillion things. The question isn't that. The question is, does it result in cells that fall within this narrow space? I mean, you've got a bunch of donut holes here, right? You've got a bunch of negatives in this claim where the resulting cells don't express this, don't express that, that kind of thing. And so the question is, if, I mean, if your cells really don't express those things, then you can't fall within this claim. Right. And I think there's a difference between whether or not these cells of, you know, these marker expressions have been identified, right? The marker expressions are a byproduct of the place in the umbilical cord that the cells are removed from. So when they're removed from the SL, right, the subethial layer, they're going to have these marker expressions, right? So it's not that the process creates the marker expressions. It's the exact, it's the, I'm sorry, it is that, right? It's not that the marker expressions, right, are different. It's just where am I getting these cells from? And then the marker expressions tell you the location of where you got them from. And so when we look at this claim. I'm not entirely following you, but for standing purposes, what I guess what I'm trying to figure out is why is there any kind of substantial risk of infringement? Because we're all getting cells, at least in part, from the SL, from the subethial layer. And that's what drives the marker expression. So when you were taking cells from the SL, that's going to necessarily mean you're getting those, you're getting those marker expressions. No matter where in the SL you're taking them from? That's what the record shows you're on, yes. And that's an important part. Like the process is, you know, there's different processes. I'm sorry. Is this going to your inherency argument? Is that why you think you're at substantial risk of infringement because this goes to inherency, doesn't it? Right, right. And I just think from our perspective, just because, whether it's a jury or us, you know, you test for different marker expressions based on what you're trying to investigate. And so from our perspective, if the cells are coming from the subethial layer, right, it's an intrinsic quality of those cells, right? The marker expression is not something separate and distinct from the process, from where you're getting it from. And that's what's key. Right. So this claim says you've got two actual process steps and then three properties, some of which are negative, right? And for your, it seems to me, for your argument to work, either there has to be some prior art showing an isolated cell, whatever that might mean, that has gone through this process, not has gone through, that results from the two process steps and has all three properties. And the board said, you haven't shown me that. Or, and this is in the end what I thought your argument came down to, is an inherency argument, that any time you perform these two process steps, you will, with 100% certainty, get an isolated cell with these three properties. That's correct. And I'm not sure I saw the evidence for that. So, and I think the evidence is this, right? It's a product by process claim, right? And so we have a claim process that's defining the product, right? This is not helping. All of your discussion of this is a product by process claim does not help me at all. There are two steps in the process required, two process steps, and the result has to be a cell with three properties. For your inherency argument to work, it has to be the case that every time somebody performs the two processes, there will be a cell with the three properties. Where is the evidence that says that? Because you don't have any specific prior art that shows the presence of these three properties. Right. And, and your honor, maybe the framework is what is confusing for us, right? We understand in a product by process claim that the, the claimed process defines and must result in the claim product, the isolated cells. And so when majority practices and discloses the claim process, we believe it necessarily. What do you mean, but you believe? I thought the board found that in majority. So, right. So with the board, let's, perfect place to start, right? With the board found and why we think there's an implicit construction, the board correctly, expressly construed the claim limitations. The board expressly construed the two process steps, rejecting patent owner's request to read in embodiments, right? That was good. So that, right. That was okay. So we were okay at that point. But that express construct was correct. That broadens the realm of the two process steps. I, I think it's, it's. It's even harder to establish inherency because now everything within the broader class, in your view, would have to produce these three properties. And, and we would suggest that it's in line with the teachings in the specification and prosecution history. So there's not broadening. It's just the proper interpretation of the claim, especially in light of the specification statements, which give alternative ways to, to do these two steps. And these two steps will result in the, the cells. No, that is the alternative ways that you choose. And, and that's correct. Is that right? Well, and that's correct. And it, and it's all because of a fundamental concept that when you sub, when you extract the cells from the subethial layer, that's what's driving the marker expression. It's, there's no, there's no magic to this. It's, you're getting it from a particular location. And that's why I think the file history is so instructive, right? Because in the file. Where, where is the evidence that every time you take a sub epithelial level, a layer of the umbilical cord tissue and you put it on a, you know, the required growth substrate, that you will get one or more cells with all of these three properties? So in appendix 94, in the 176 patent in column one, the specification goes on to explain the isolated cell that is capable of self renewal and cultural expansion and is obtained from the subethial layer of a mammalian umbilical cord tissue is provided. Such an isolated cell expresses at least three cell markers. And, you know, dot, dot, dot, and does not express at least three cell markers. I'm, I guess I want to say two things about that. I'm not sure whether it counts what is said in your specification as evidence. In the 176 patent. I'm talking about the patent in suit. That's right.  And second, what you just read does not say that whenever you do this, these two process steps, which are just, where you're taking it from, the sub, you know, the SL, as you say, you always get this. Those words that you read do not say that. I think it's just saying such an isolated cell that was taken from that is what it expresses. You got one. That doesn't mean you always get one. Right, and that's why I think, Your Honor, that maybe there's a disconnect in the record. I think what we're trying to demonstrate is that when the specification and the file history make clear that the process, the two step process, that they obtained a product by process claim on, when those two steps, and everything in the record demonstrates that those two steps create the isolated cells. Right, that's what the specification supports. That's what the file history supports. In those situations, right, if Mejuri is teaching and disclosing, and they didn't just say that Mejuri is, it's literally on 32 of the appendix, right? I mean, I think this is what is troubling for us, Your Honor, is that on page 32, the board finds that both Mejuri and 176 patent disclose umbilical cord tissue cut into sections and placed into environments fostering cell culture and replication. And it goes on to 33, and this is the part that the board gets correct, which is Mejuri and the 176 teach the claimed process. And everything in the intrinsic record says that the claim process yields the claim of isolated cells. Always yields. That always is the crucial thing for you. And in a product by process claim, Your Honor, it has to, right? It has to. That's not helpful. That's a conclusion. The words of the claim say process with the following property. You're telling me that the prior art, by establishing, by showing a process, necessarily has the property, even though those cells did not show the property. I'm not sure about the last part of your sentence, of the statement or the question. But what I guess I'm suggesting is, what we're arguing, Your Honor, is that in a product by process claim, the bargain between the patent owner and the patent office is that I'm not defining my product, my isolated cell in structural recitations. They had a product claim in the file history, and they amended it to be a product by process because the way they obtained the patent was saying, this process is different than the process in the prior art, and therefore we're entitled to this product by process claim. And under those circumstances, they're bound by those representations. To the point you're making, they're bound by the statement of, this process yields this. That's the relationship in a product by process claim. Here it's even more than just that the nature of the claim suggested. It's because they changed it from a product by process claim. Then they argued the process, this ex-plant process that's claimed, was different than the enzymatic process that was in the prior art. And then the patent office and the examiner, in the notice of allowance, agreed and relied on it. And the specification is consistent, saying all you need to do is those two steps, and there's nothing contrary. There's nothing contrary in the record that suggests the claim process, which majority teaches, doesn't yield the isolated cell. And I would suggest, Your Honor, that was an argument they could have raised, right? Because the board adopted our claim constructions, right? That they're now suggesting are so broad. Those were our constructions down below. And so if their argument down below was, if you adopt these constructions, the claim process will not yield the claim product. And that's a problem. That was an argument, Your Honor. And what we would suggest, and what we submit, is that in this situation, the burden shouldn't be on us as petitioner. We've shown that in a product by process claim, the claim process was known, well known. And if the process is known, then the product's known. And I think there was confusion by the PTAB about In re Thorp, and what Judge Newman was expressing. And all she was expressing was, for a product by process claim, if you have a prior art product, you don't have to have it use the same process as this claim. And that's understood. But when you do, you're not entitled to a process claim. You're not entitled to a product by process claim. Those, you're out. I mean, King Pharmaceutical, there's many federal circuit decisions that demonstrate, if you're relying on the process steps to demonstrate the patentability of the claim, much less define it, the burden should have been on them to show, our claim process doesn't yield. Even though we've told the patent office it does, even though that's the reasons for allowance, and we can give appendix sites for all of this. I think it's at appendix 909. Thank you. This is what everything was based on, that this process yields this isolated cell with this marker expression. And after finding out, many years after the patent issues, patent owner says, oh, those two steps, those two steps that we relied on to get the patent claim out? Now that we know those were in the prior art, they're not sufficient to show that the process discloses the claim. That's not appropriate. Everything in the intrinsic evidence supports it, and nothing is contradictory. And we have a product by process claim. It's the whole reason we have these claims, is when the product, it's supposed to be when the product resists definition. And the only way you can produce to express it is through its process. That's what they chose. This was an intentional choice. They didn't need to do this. They have other patents with other types of claim types in it. But here, they chose a product by process, and they're bound by it. And we believe it's, you know, the evidence is overwhelming that there's inherency. But it's inherency through the claim process, now that the judge has found it. He found the claim construction was correct, and he found that the jury teaches the claim process. Once you get to that point, it necessarily follows because of the nature of the claim, but not only because of the nature of the claim, but because of the prosecution history, because of the specification, because they're clear and consistent that that claim process results in a meal to the claimed isolated cell. And, you know, again, these are intentional choices. They had a product claim. They converted it, right? They didn't have to argue the process creates it. They did. You know, down below, they could have raised this issue. Based on the boards, you know, they could have raised the issue that our construction was so broad that it divorces the process from the claimed product. OK, well, we've used all your time, and you're out of time. Let's hear from the host and counsel. Thank you. May it please the court. As the appellant and the party seeking judicial review, it is re-STEM's burden to come forward. It is re-STEM's burden of production to come forward with evidence demonstrating that it has Article III standing to appeal the board's final written decision, finding that re-STEM had not carried its burden of proof at trial. As this court found in Figenics, the appellant must identify relevant evidence demonstrating its standing either at the board level or in response to a motion to dismiss or in its opening brief. Let me ask you a question. Does performing the two steps always result in the three properties? It does not, Your Honor. And in fact, the evidence that is on the record is the part of the board. Where's the best evidence on the record for that?  KEDA reference and the FAN reference. Page slide. KEDA reference is APPX1919. The KEDA reference, the board found that the KEDA reference disclosed the two steps. But it also found on APPX1927, this is the KEDA reference, that 100% of the cells expressed NANOG. And as this court knows, that is one of the negative limitations in the claim. And the board found that where? Sorry. That is on APPX70. Seven? Seventy. The board says, while KEDA cells are closer and that they satisfy limitation D, they strongly express NANOG. And KEDA does not disclose non-expression at least five of the markers in limitation E. The board goes on to say that if petitioner had provided evidence that the process steps always result in the claim cells, well, then they might have an argument. But they didn't come forward with any of that evidence. And that's where ReSTEM's argument falls apart. FAN is another reference, Your Honors. FAN is, well, just out of curiosity, help me understand how I should understand what the patentee's burden is in a product by process claim. The patentee's burden in demonstrating validity or invalidity rests solely on whether the product is new or not in the art. This court's longstanding precedent is that it looks only to whether the product is present in the prior art or not. Now, the inherent interest of the product is present in the prior art. I don't entirely follow. You mean as produced by the same process? No, whether it's there or not, regardless of the process. The process steps are ignored. That's very clear from this court's history. And that's the exact opposite of what ReSTEM would have this court do. ReSTEM is submitting to the board, hey, all you do is look at the process steps. And once the process steps are met, then as a matter of law, you must find that the product is also present. And just so I understand, your point is it is a matter of fact whether a process always produces, or in any given case, produces the actual claimed properties. And you can't ignore those. But you have to either show that here's something produced by the process that has those properties, or you have to show that everything produced by the process always has those properties. That is correct. And that's what the board found as well. And the board found that there were other factors and conditions that led to the resulting claimed sales. ReSTEM, on appeal, says that those other factors and conditions are implicit claim constructions. But that only follows if you agree that as a matter of law, no matter what you recite in the process steps, then the product will always follow. And that is just not the law. I will note that, yes, yes. Can I ask, do you have either a written description or an enablement problem when you have a claim like this that basically claims a cell by virtue of what it expresses or doesn't express, but doesn't tell you how to achieve that expression? Is your honor asking about the board's notice about how they are trying to construe the term express does not express? No, I'm not that specific. I'm just wondering, you have two steps that produce cell lines. But you're saying those steps themselves don't matter to how the scope of the claim should be construed. It's, in fact, the product that is the result. But you haven't explained how to create the product that is this resultant product. And those are separate analyses. The scope of the claim under Nautilus is based on a person of ordinary skills understanding of the art when they read the claim in the context of the specification. Does it teach the person of ordinary skill in the art how to make and use the invention? And the specification absolutely does. The claim doesn't have to do that. The claim doesn't have to teach you. The process A and process B don't have to teach you. A dumb question. Does the specification in this case articulate the additional steps that are necessary to ensure you get the resultant three properties? Yes, your honor. And I can cite you that. It is on APPX 97, column 8, lines 49 through 58. It's also in the examples, example number 2 on column 13. This is APPX 100. And that's the example 2 that the board presents. RE-STEM likes to make a big fuss over the different ways that you can. My only concern with example 2 is that example 2 is about umbilical cord tissue as opposed to SL, which is what the claim is directed to. And those are two different things. Umbilical cord tissue is a much broader thing and could, in fact, result in cell-on-cell impurities that cause it not to fall within this. So I don't think that example 2 actually is this claim at all. Am I missing something? Because this claim is about only using SL, right? Column 8. Oh, I'm sorry. Did I miss something? You just said example 2. I did. Example 2 is in column. So I went to example 2, but example 2 is umbilical cord tissue. Do you agree with me? Yes. It's umbilical cord tissue, which is a broader class of tissue than SL. Absolutely. So, OK. All right, so that's not relevant to claim 1. It's not the same. Where else were you pointing me? Column 8. Yeah, column 8. Lines 50 or 49 up above. Well, actually, let me go up even a little bit above. 43. There in one aspect, for example, umbilical cord tissue can be collected and washed to remove blood, Wharton's jelly, and any other materials associated with the SL or subepithelial layer. For example, in one laminate, well, I don't need to read it for the court. The court has it there. I'll just give you a quick rundown of what it means. I can imagine this piece of paper is the umbilical cord. The outside layer is the epithelial layer. The inside layer is the subepithelial layer. And the material that's inside of it is the Wharton's jelly and the blood vessels. What Dr. Patel invented was he opened up that. He removes all the Wharton's jelly and all the blood vessels, and he places it face down on the growth medium. And that's how he actually gets the results. Now, we argued to the board that the process steps should be construed narrowly to read on that embodiment. The board disagreed with us, and they read them more broadly. But that is the answer to your question, Your Honor, about enablement and written description. Does the court have any other questions for me? It's been a long day for you, and I'm happy to answer them. We have not talked, either with you or your opposite number, about this question of whether an isolated cell can be a single cell, or is instead limited to some collection of cells for which you can determine a registered amount of expression? Are we not talking about it because it doesn't matter to the outcome here, or what? Well, first, well, I'll answer your second question first. It doesn't matter the outcome. There is no prejudice, because there is no evidence that even whether it's a population of cells or a single cell, there's no evidence anywhere in the record of any single cell that has all of the gene expression markers, none. So if it is error, it's harmless error. We would also submit that it is not error. There are many different canons of claim construction that litigants lean heavily on, and they certainly will lean on the one that favors them during their argument. This court has said that the claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent. If one were to look at the term isolated cell in a vacuum, as proposed by Riestan, well then, their argument might make sense. But the board looked at the intrinsic and the extrinsic record and found that, yeah, express does not express is understood in terms of cell populations, not cells all by themselves. Are there any other questions, Your Honors? OK, thank you. So just working backwards, Your Honor, we do feel that that issue about expression, nonexpression, and population of cells does matter. I think the detailed description in column 6 of appendix 96 under a section called definitions, it has a definition for it that says one or more cells. Patent parlance, going back to Landis, says A or N means one or more. So I don't think there could be any dispute. It's a clear error. We think it impacts the analysis potentially if the court was willing to remand it for the court to have the right constructions down. But we also think it's important because I think there's some confusion. I think Your Honor just mentioned this claimed process only takes the cells from the SL, from the subethial layer. And that's not what the board found. Their express construction was you could have a chunk of umbilical cord. And that's exactly what Majorey teaches. That was the part I read on 32 from the appendix. The board actually found that Majorey discloses the same embodiment as the 176 PAT does. And that's a slice of an umbilical cord where you have cells from a lot of different places. You're going to have them from the SL. And that's why it's going to necessarily produce these isolated cells with the marker expression. But that's where the confusion comes in. When you start talking about populations of cells, it makes it sound like it has to be a heterogeneous situation where it can only produce cells with these markers. That's not what the claim process is about. The claim process, there's different embodiments. They make clear that you can use any of them. A variety of techniques can be used. The board expressly construed it properly. And what happens is in the anticipation analysis, you see the board saying, well, comparing the prior art Majorey and saying, it doesn't disclose the interior side down embodiment. Well, that's not part of the express construction. OK, counsel. I think our time is up. I thank both counsel. This argument is taken under submission. Thank you, Your Honor.